Good morning. May it please the court. My name is Julian Baum. I am here representing plaintiff and appellant Mark Eppler. With the court's permission, I would like to reserve five minutes of my time for rebuttal. In this case, we have a very unusual situation. There are two main points that I want to bring. I want to focus on the court's attention. The unusual situation is that this case, with one distinction, was basically decided by this court a couple of weeks ago. And that is Montour v. the same defendant, Hartford Life, in a case that is remarkably the same on almost every issue. It's because it's not that surprising because it's a long-term disability case in which the Hartford followed its normal protocol for investigation and decision. And so this was brought fully before the panel of this court, and the court was called upon and did address just about every issue in this case. It's about as much on the so-called all fours as cases get, with one exception. And that exception is the second thing that I wanted to talk about. The exception is that the case before the court now, the Epler case, is even stronger on a critical, critical fact. In the Montour case, Hartford's consulting physicians opined that the plaintiff was not disabled. In the Epler case, the Hartford's expert agrees that Mr. Epler, and I want to quote the characterization, that Mr. Epler has significantly diminished functionality with resulting inability to perform any position requiring minimal cognitive functioning. When was that opinion given in terms of the timeline with respect to the surgeries that were performed? Significantly later. It was during the appeal of Mr. Epler's termination of his benefits. So after he was paid for two years under the own occupation part of the policy, and then with the test change to any occupation, his benefits were terminated. Mr. Epler appealed, and during the appeal, the Hartford had his records reviewed by a specialist, Dr. Andrew Filderman. The remainder of that paragraph, though, quite a bit softens the part that you read. The sentence that you read is really a part of a sentence that says that's what Dr. Lewis says. By Dr. Lewis's examination, there was this diminished functionality, et cetera. And then he goes on to say, however, I do not have any corroborating information from Mr. Epler's treating physicians. I continue to believe that Mr. Epler's level of obstructive sleep apnea or other something I can't pronounce results would not explain the cognitive abnormalities or level of sleepiness and so on and so forth. So what you've done is, to my mind, take half a sentence or 90 percent of a sentence out of context. May I address that? Please. Okay. I think that he does conclude that there are conclusions here that I think one could parse, but I'm not taking that out of context because what he goes on to say, as best as he can be helpful, is to say I agree that Dr. Lewis's examination found this. He agrees with that. He says I don't. Well, how could he not? He's really just saying this is what the guy found, and the guy found whatever he found. Right. Because he goes on to say the primary sleep apnea in and of itself doesn't account for this, but there may be a secondary problem. In other words, he's saying I'm going to confine myself to one factor here, and confining myself that way, I can say that I don't believe he's significantly diminished and he can work. I respectfully submit that if one reads the entirety of the report without picking out, without my picking out or anybody picking out particular sentences, because it is trying to be crafted artfully and in depth, what Dr. Filderman is saying is if I limit myself to the primary sleep apnea, then I can give you the opinion that he can work full time. There may be something else going on, and I don't dispute Dr. Lewis's finding of significant diminished functionality. I want to ask you about the surveillance videos, because that seems to me to be quite significant in this case in support of the decision that was made. And I'm just speaking for myself and my own tentative view. At the time that this all started, your client did not just complain about sleep apnea, but complained about back problems that were absolutely debilitating, could hardly move, and so on. So the surveillance appears to show that he moved around pretty freely. So it has nothing to do with sleep apnea, but it does have to do with his credibility of his various complaints. Why isn't that an adequate basis for disbelieving the extent of his complaints that can't be corroborated by objective medical evidence? Because I've viewed the video, and it seems very much to my eye to fall within the kind of surveillance that this court and the district courts repeatedly have said this really doesn't show us anything. What the video... I don't care about other cases, because maybe in those cases it didn't. In this case, the guy says it takes me 20 minutes to walk one block. I walk with a terrible limp. I'm in agony all the time. And the video really gives the lie to that. I really don't think so. I saw the video, and what he was doing was standing, swinging a bat like this. And he's at his son's game, and that's what he's doing. He's not flat on his back moaning, and he's never claimed to be bedridden. The way I read it, I don't see that he's claimed to be bedridden. He's trying to be as active as he can. It's, in fact, stands in stark contrast, this video, this video I'm talking about, stands in stark contrast to things like what the Eleventh Circuit viewed in the Cox case, where someone was so striking about it, it was a baseball case, where the video supposedly showed the plaintiff pitching batting practice. Yeah. If we were to disagree with you about the significance of the video... Yes. ...is that a permissible basis to disbelieve subjective complaints about other body parts? It is certainly, if you were to disbelieve, if you were to view the video differently, then I think, of course, it would, if he made a contrary statement that is at or about the same time, I mean, talking about his condition, at or about the same time, it would lead, I think, a reasonable person to view those statements with skepticism. However, at the point where this decision is being made, what is at issue is not his back condition, which may get better, worse, may be that his doctor, it isn't even an issue, or his doctors may... No, the point of it isn't that that's, it doesn't show anything about being sleepy, but if he's complaining... It shows him to be a liar. Right. Yeah. If you believe that this shows him to be a liar, then I think one can and should view his subjective statements with skepticism and to look at the medical evidence with a more probing view. But I submit on that, for example, this gentleman who has a history of high-level employment and achievement and service also went through three major surgeries. If he's a liar, to speak colloquially, he sure is putting his money where his mouth is. If he, whether, let's assume the worst, let's assume he exaggerated terribly his back condition, which I don't think is the case, but let's assume it. His sleep apnea problem, he has undergone major surgery repeatedly under the, and not with a plastic surgeon of his choosing, but with arguably the most highly respected sleep specialist in the country at Stanford. The issue, then, is whether his continued statement that in spite of those remarkably in-depth treatments, he still has the same problem is the credibility of that last piece. I think that's the issue. I think that would be a factor that absolutely one would look at. If you think his statements are incorrect or if he's lying, then I think one would have to look at what the doctors are saying they observed, whether he fooled them, basically. Whenever a patient is describing to a doctor his or her history, what my symptoms are, doctors have to discern as a matter of everyday practice. What do I observe under my, in accordance with my education, clinical experience about what I'm being told? Is it being exaggerated? Is it being incompletely? They have to view with a critical eye what they're seeing. And I think if you don't trust the plaintiff, it doesn't mean that the doctor's reports all go out the window because they're relying at least in part. Counsel, your client was deemed disabled by the Social Security Administration. That is correct. And that's a fairly rigorous process. We see a lot of those cases here. Sure. Was the surveillance video in evidence before the administrative law judge in that proceeding? We don't know because it wasn't considered at all during the administrative process. Do you know how much of the evidence from the doctors that testified in this proceeding or which we have letters were available in that proceeding? We do not know. I have an educated guess, but we don't. The record from the Social Security Administration was never considered during the administrative process or the appeal in this case. Was there an appeal in that case, or did your client win that before the ALJ? I don't know. I think it was on the first pass. If the surveillance video was not in evidence before the ALJ, what weight should we give the fact that the Social Security Administration found your client to be disabled? Well, I think, frankly, it depends on how you view the videotape. If you're thinking that, as in many cases, it's a snapshot, then you have to ask does it show whatever it shows about the particular moment, which I don't think it shows much of anything. But you still have to go from what does it show, what does it show, not just about what he's doing now, but can he work full time. I viewed the videos. Okay. May I ask what you thought? Well, no. I appreciate the question, but I'm going to respectfully decline at this point. I'll give it to you in writing later on, though. The incident with him leaning on the bat and then sort of swinging it gently back and forth, and then there's a second one where he is dragging the ball bag, and then we see him walking along the street in what appears to be a shopping district with his son. And, finally, the fourth segment is at home doing some yard work. How many days are we talking about on those incidents? I don't know. Are those four separate days? Are they two separate days? Are they adjacent days? I can tell you that the record makes that clear, I believe, but I don't know the answer to that sufficient for me to say that to a court of appeals. I don't know the answer to that. But it is the reports of the investigators who are summarizing their video, I believe, tell us that. So you don't know whether this could be over a week's time or whether these were adjacent days all during the same month or same week? I don't know that. I think there were two episodes of several days and then a gap and then another several days. You have about a minute remaining if you wanted to save some for rebuttal. Well, I guess what I'll say is that no matter how you view the video, that wasn't the idea. The district court didn't say, well, I disbelieve his statements from because of the inference that you can't believe his statements about the sleep apnea and that you and that he is, in essence, fooling his doctors and taking all these drugs to be consistent with that. In addition, in addition to the video, the Montour case, I think, on all of the issues here, in addition to the video and besides the video, are sufficient that there is no distinction here except in favor of a finding in my client's favor. With that, I have about 13 seconds. So unless the Court has questions, I will yield. Thank you, counsel. Good morning, Your Honors. May it please the Court. I'm Laura Fannin representing the appellees in this matter. Just to answer Judge Bybee's question, the award of Social Security disability benefits was, appeared to be on first pass, and it was awarded July 5th, 2005. And the surveillance, the first surveillance was done in August of 2005, so they did not have the benefit of the surveillance videos. And the surveillance videos were done on August 6th, 7th of 2005. September 20th, 21st, November 6th, and 7th of 2005. Okay. Now, I assume that I didn't see six days. It didn't look like six days. It looked like it could have been as many as four, but I'm not sure. There were three days in which he was not observed. That was August 6th, September 20th, and November 7th. So what we had was three days. Three days. And the first one where he's swinging the bat, can you give us the date on that? Do you know which one that is? That was November 6th. Okay. And carrying the ball bag, is that the same day? Yes, it was. Okay. And how about walking with his son in what appears to be a shopping area, maybe at the mall or on a commercial street? I am not sure about that. I'd have to look at it. And how about the yard work? I am going to refer the Court to the record at ER 118 and following for the summary of the dates on those, that those things occurred, because I don't have them in mind right now, and I don't want to take the time to look at them. Thank you. Because counsel started with Montour, and it's the obvious case to start with, I'd like to make some distinctions from that case. It is, in fact, not on all fours, despite the fact that it's the same insurance company. Montour was a bench trial and on the administrative record, so the burden language that Judge Alsop used in his opinion was actually just the summary judgment language that later was approved in the Nolan case as appropriate for ERISA reviews. In Montour, as the Court has pointed out, well, as the Court has pointed out in this case, the allegations concerning level of disability were inconsistent with what was seen in the surveillance, whereas in Montour they were consistent. Well, the one thing that troubles me from your side of the case is that Montour sets out a number of indicators of conflict that a district court should take into account, and at least on an express level, the district court didn't separately think about all the things that we listed in Montour, which isn't surprising because Montour came a lot later than the district court's decision here. But in view of that, what should we do about that? Should we look at those extra indicia? Should we send it back to the district court to look at those extra indicia? Do they make any difference? Are they just guidance that we can ignore? What is your view of what to do about that list in Montour? I think I'm going to hit some of those things. I would say that if the Court isn't satisfied that they were sufficiently addressed in Judge Alsop's opinion, that it should go back to him, as the Court did in the Lepvinut case, where they sent it back to the district court to apply the correct standard, although they had used, as Judge Alsop unfortunately did, some pre-Abadi case law. So, for instance, the consideration of the Social Security Award, is that one of the factors that? I believe it is. That was something that was articulated in Glenn, which came out after Judge Alsop's opinion. And it was not something that was considered expressly in this case for that reason. It wasn't quite on the radar screen. Or the talking about lack of bias in an affirmative way, that was something that also came out in Glenn as something that was recommended for insurers to do. And there was a month between, because the appeal was decided during the litigation, there was a month between when the appeal was decided and when we had to file our motion for summary judgment. So there really wasn't time to work up a lack of bias. Did Judge Alsop take into account the conflict that Hartford has in being both the judge and the payor here? He did. And he articulated that in his opinion, even though he couched it in language that was not necessarily the Abadi language. But he talked about the factors that, how he weighed the fact that there was a conflict of interest. There were multiple citations to Abadi. And his order at page 10 described in some detail the way in which he was looking at the evidence itself. I'm sorry. I've got, I have his order at 10. I think it, I assume it's the one that you're referring to. I don't see the language discussing Hartford's potential conflict of interest. I think you're reading page 8. I'm sorry. I think I was citing the factual recitation. I'm sorry. I do see it on page 11 of the order I'm looking at. And 8 also. 8. It talks about being the claims administrator and payor creating a conflict of interest under Glenn. In sum, this order reviews Hartford's denial of benefits for abuse of discretion, of which Hartford's conflict of interest is one factor. That's correct. He just discusses a, he discusses Glenn at one point on page 8. He discusses a body and its requirements on page 11. He was well aware of the requirements of the two cases as far as I could tell. So this, Montour was a case that addressed the standard of review, the conflict of interest issue. And this is not a case in which the standard of review should eclipse the merits of the claim. It's one in which the claim administrator, the Hartford, relied on Mr. Epler's own doctor's opinions that he was able to work on their statements that his sleep condition improved after surgery on negative test results that addressed both the sleep symptoms, which, and the nature of the disability did seem to be a moving target, and that Hartford tried to move with it depending on where the emphasis seemed to be in his symptoms. And then there was the surveillance that showed a level of activity that was far exceeded his claimed limitations. So regardless of how much skepticism is applied, and there's no question that the Hartford was a payor that had an interest in the outcome. I mean, there's no question there was a structural conflict of interest here. And even though there were some what the Kaiser case called infelicitous references to preabody case law, Judge Alsop reached the right result here. And I believe if it were sent back to him, it probably would be the same result because the evidence is the evidence in the administrative record. There are many points that we made in our reply, and I would prefer to address any questions the Court has rather than belabor points that are not in our appellee's brief. I don't believe any of us has any specific questions for you. You're welcome to use or not use your remaining time as you see fit. Okay. Well, let me finish with the distinction for Montour because that was something that I appreciated as an issue, of course. There was an issue in Montour about, and I think it was a Saffin issue, the Saffin case, too, about the lack of degeneration as showing no ongoing disability. And in both Saffin and Montour, the statement was if they've been paying benefits, there needs to be a showing of improvement. And that also was here in this case. There was the showing of improvement of the sleep symptoms as referenced by his own treating physicians. And so we're not in the same category or in the same situation as they were in the Montour case. And Montour also talked about the paper review, and maybe they should have had somebody look at him. And here, because they were relying on his own doctors in the first instance, it was appropriate to do a paper review in the second. And I don't think I need to address what Dr. Filderman's report said, because it said what it said, and the Court obviously has read it. And I don't read it the same way as Mr. Epler's counsel does. But it's clear that he felt that there was not a sufficient basis to say that he couldn't do his job or do some kind of work under the disability definition. I think I will leave it at that. Thank you, counsel. Thank you. Mr. Baum, we used up all of your time, but you may have a minute for rebuttal if you'd like it. I think as you go down the Montour case and compare it with this one, you'll find tremendous similarities that are troubling and I think have to be dealt with, such as the adversarial position taken by the nurse with the treating physicians and sending this kind of a letter, then relying on what comes back, which was inadequate. But step by step by step, the things that troubled this Court in Montour, I respectfully submit, should trouble the Court in this case. It was the same kind of thing. Also, last point, Judge Alsop explicitly applied the Boyd case. This Court in Montour addressed that and said Boyd only applies where there is no conflict of interest. In other words, where the inherent conflict of interest doesn't apply. Here, without any further evidence about the conflict, we have the inherent conflict identified in the body and that we have any time the funding entity is the deciding entity. So I respectfully submit that the opinion below was based on old law and the overall view of old law, and with that I will stop, unless the Court has questions. I don't believe that we do. Thank you very much. Thank you very much. This has been helpful arguments from both parties. The case just argued is submitted and will take about a 10-minute recess.
judges: Tashima, Graber, Bybee